960 F.Supp. 206 (1997)
Franklin MANGE, et al., Plaintiffs,
v.
PETROLITE CORPORATION, Defendant.
No. 4:95 CV 01338 SNL.
United States District Court, E.D. Missouri, Eastern Division.
April 11, 1997.

MEMORANDUM
LIMBAUGH, Senior District Judge.
This matter is before the Court on cross-motions for summary judgment (# 57 and # 59). The parties have agreed, in lieu of trial, to submit the case on the basis of the *207 pending summary judgment motions, together with affidavits, responses and additional documentary evidence.
The Plaintiffs, a group of the Defendant's former employees, seek compensation for their unused vacation days earned in the fiscal year ending on October 31, 1994. The Defendant argues that the Plaintiffs have waived the right to litigate these claims. Alternatively, it argues that the Plaintiffs are not entitled to any additional compensation under the terms of the separation agreements entered into by the parties. The matter has been fully briefed, and the Court is prepared to consider the motions without oral argument.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
On September 1, 1994, William E. Nasser, the Defendant's chairman, president and chief executive officer, issued a letter to the Defendant's employees. Ex. A to Def.'s Mot. for Summ. J. He reported that the performance of the Defendant's U.S. and Canadian oil field operations was "unacceptable," and that it was necessary for the Defendant to "take additional action to effect a turnaround." Ex. A to Def.'s Mot. for Summ. J. at 1. Accordingly, he announced the pending implementation of three separate programs to assist the Defendant in a reduction in force  a special voluntary retirement program, a voluntary separation program, and an involuntary separation program. Ex. A to Def.'s Mot. for Summ. J. at 1. The Plaintiffs were all participants in the special voluntary retirement program or the voluntary severance program (the "voluntary programs"). Exs. D, E, F, G, H, I and J to Pls.' Mot. for Summ. J.[1]
The Plaintiffs argue that the separation agreements they signed as participants in the voluntary programs provide: "... nothing in this agreement is intended to or shall be construed to affect [the] Employee's right to any benefits under the terms and provisions of [the Defendant's] benefit plans and programs...." Exs. M and N to the Def.'s *208 Mot. for Summ. J. at 2. Moreover, the Defendant's written vacation policy provides:
After a regular, full-time employee has twelve months of continuous service the vacation for which he or she is eligible, as of the beginning of the current vacation year, shall become a vested benefit as of October 31.... Therefore, an employee terminating on or after October 31 is entitled to pay in lieu of vacation for any of his or her vested benefits unused as of the date of termination, but shall not be entitled to any additional pay for vacation accrued for the period from November 1, to the date of termination.
Ex. F to the Def.'s Mot. for Summ. J. at 3. Accordingly, the Plaintiffs argue that vacation is an employee benefit and that they are entitled to compensation for their earned but unused vacation days pursuant to the Defendant's standard vacation policy.
The Defendant contends that the Plaintiffs are only entitled to the compensation provided by the voluntary programs. It argues that the Plaintiffs had approximately six weeks to decide whether to participate in the voluntary programs, were encouraged to consult with an attorney, a financial planner or a professional tax advisor, and received ample consideration for their participation. Additionally, it argues that each of the Plaintiffs entered into a valid and binding release of all claims "... arising out of or in any way related to his or her employment with the [Defendant]...." Exs. M and N to the Def.'s Mot. for Summ. J. at 1. It is undisputed that the present claims arise out of the Plaintiffs' employment.
Furthermore, the Defendant insists that the Plaintiffs were fully aware of its position with respect to vacation pay prior to signing the separation agreements. To alleviate any confusion on the issue, Fred Olson, the Defendant's Director of Human Resources, issued a second letter on October 25, 1994, clearly stating the Defendant's position and extending the time period in which the Plaintiffs could revoke their acceptance. Ex. O to the Def.'s Mot. for Summ. J. All of the Plaintiffs except Keith Ball, who was out of the country in 1994, admit that they were aware of the Defendant's position with respect to vacation pay prior to the expiration of the time to revoke their acceptance. Ex. G to Def.'s Mot. for Summ. J. at 52; Ex. H to Def.'s Mot. for Summ. J. at 70-71; Ex. I to Def.'s Mot. for Summ. J. at 27; Ex. J to Def.'s Mot. for Summ. J. at 36, 42; Ex. L to Def.'s Mot. for Summ. J. at 23, 28, 48, 50; Ex. P to Def.'s Mot. for Summ. J. at 27. Accordingly, the Defendant maintains that the Plaintiffs have "knowingly and voluntarily" waived the right to litigate the issues presently before the Court.
Alternatively, the Defendant argues that the Plaintiffs are not entitled to any additional compensation under the terms of the vacation pay provisions in the voluntary programs. Both programs were accompanied by a summary plan description which states that participating employees will receive payment "for earned but unused vacation not taken prior to October 31, 1994." Ex. C to the Def.'s Mot. for Summ. J. at 3; Ex. D to the Def.'s Mot. for Sumn. J. at 4. Under the Defendant's written vacation policy, vacation days earned in a given year vest on October 31, the last day of the fiscal year. Employees, however, are not entitled to take their vested vacation days until the following fiscal year beginning on November 1. Accordingly, the Defendant explains that the language used in the summary plan descriptions contemplates payment only for the earned but unused vacation days that the Plaintiffs were eligible to take on or before October 31, 1994, or, for the unused vacation days earned in the fiscal year ending on October 31, 1993. It is undisputed that the Plaintiffs were compensated for these vacation days.[2]
Finally, the Defendant argues that the cover letter accompanying the summary plan descriptions states: "This is a voluntary plan. *209 If you elect to participate and your election is accepted, you will receive the compensation and benefits described in the plan and your employment with [the Defendant] will end on October 31, 1994." Ex. C and D to the Def.'s Mot. for Summ. J. Moreover, the separation agreements signed by the parties each contain a valid integration clause and state that the separation agreement supersedes any and all agreements which may exist between the parties and any and all obligations the Defendant might owe otherwise with respect to the matters set forth in the separation agreement. Exs. M and N to the Def.'s Mot. for Summ. J. at 1-2. Accordingly, the Defendant argues that the Plaintiffs are precluded from claiming any benefits under its written vacation policy.
The Court has previously determined that this action involves the interpretation and application of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. Mange v. Petrolite Corp., 4:95 cv 1338 SNL, 1995 WL 926018 (E.D.Mo. December 22, 1995) (Memorandum and Order denying the Plaintiffs' Motion to Remand).[3] Under ERISA, a release of claims by plan participants is valid so long as it is knowing and voluntary. Leavitt v. Northwestern Bell Telephone Co., 921 F.2d 160, 162 (8th Cir.1990); Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 587 (1st Cir.1993); Dist. 29, United Mine Workers v. New River Co., 842 F.2d 734, 737 (4th Cir.1988). In determining whether a release is knowing and voluntary, the Court must consider:
(1) [the employee's] education and business experience;
(2) [the employee's] input in negotiating the terms of the settlement; (3) the clarity of the release language; (4) the amount of time [the employee] had for deliberation before signing the release; (5) whether [the employee] read the release and considered its terms before signing it; (6) whether [the employee] knew of his rights under the plan and the relevant facts when he signed the release; (7) whether [the employee] was given an opportunity to consult with an attorney before signing the release; (8) whether [the employee] received adequate consideration for the release; and (9) whether [the employee's] release was induced by improper conduct on [the employer's] part.
Leavitt, 921 F.2d at 162.
In this case, it is clear that the releases were knowing and voluntary. The Plaintiffs were all management level employees, the release language is clear and unequivocal, and the Plaintiffs received adequate consideration in exchange for their releases. Furthermore, the Plaintiffs had approximately six weeks to decide whether to participate in the voluntary programs, were encouraged to consult with an attorney, a financial planner or a professional tax advisor, and admit to reading the release language before signing their respective separation agreements. Finally, all of the Plaintiffs except Keith Ball testified that they were aware of the Defendant's position with respect to vacation pay *210 prior to the expiration of the time to revoke their acceptance.[4]
The Plaintiffs' arguments to the contrary are unavailing. If they were not satisfied with the terms of the voluntary programs, they should not have agreed to participate. Even if the Defendant's position with respect to vacation pay was initially unclear, it was fully explained prior to the expiration of the time in which the Plaintiffs had to revoke their acceptance. To suggest that the Olson letter of October 25, 1994, left the Plaintiffs with the Hobson's choice of accepting the voluntary programs without the additional vacation pay or taking their chances with an involuntary severance and no termination benefits is ludicrous. That is precisely the decision that was posed to the Plaintiffs in the first instance. There is simply no indication that a prior acceptance and revocation of one of the voluntary programs would have adversely affected the Plaintiffs in the implementation of the involuntary severance program. Accordingly, the Court concludes that the Plaintiffs have knowingly and voluntarily waived the right to litigate the issues presently before the Court.
Alternatively, the Court concludes that the Plaintiffs are not entitled to any additional compensation under the terms of the vacation pay provisions in the voluntary programs. The benefits provision upon which the Plaintiffs base their claims contains an additional clause. The whole provision reads: "... nothing in this agreement is intended to or shall be construed to affect [the] Employee's right to any benefits under the terms and provisions of [the Defendant's] benefit plans and programs, except for those rights available only under [the voluntary programs]." Ex. M to the Def.'s Mot. for Summ. J. at 2-3; Ex. N to the Def.'s Mot. for Summ. J. at 2 (emphasis added). Read in conjunction with the express vacation pay provisions in the summary plan descriptions, and in view of the integration and supersession clauses in the separation agreements, it is clear that participating employees are entitled only to the vacation pay provided by the voluntary programs.[5] Had the voluntary programs been silent on the issue of vacation pay, the Plaintiffs' argument that the Defendant's standard vacation policy should control would be more forceful.
The vacation pay provisions in the voluntary programs provide participating employees with payments "for earned but unused vacation not taken prior to October 31, 1994." Ex. C to the Def.'s Mot. for Summ. J. at 3; Ex. D to the Def.'s Mot. for Summ. J. at 4 (emphasis added). As stated above, pursuant to the Defendant's standard vacation policy, employees are not eligible to take the vacation days earned in a given fiscal year until the next fiscal year. Accordingly, the phrase "not taken" modifies the "earned but unused vacation" for which the voluntary programs provide compensation. Since the Plaintiffs were not eligible to take any of the disputed vacation days until November 1, 1994, it is clear that the voluntary programs do not include payment for those earned but unused vacation days.
Finally, the Court concludes that the Plaintiffs' claims are barred by the doctrine of equitable estoppel. See Peerless Supply Co. v. Industrial Plumbing & Heating Co., 460 S.W.2d 651, 665-66 (Mo.1970). "Estoppel arises from the unfairness of permitting a party to assert rights belatedly if he knew of those rights but took no steps to enforce them until the other party has, in good faith, become disadvantaged by changed conditions." Speedie Food Mart, Inc. v. Taylor, 809 S.W.2d 126, 131 (Mo.App. *211 1991). As stated above, each of the Plaintiffs entered into a valid and binding release of all claims "... arising out of or in any way related to his or her employment with the [Defendant]...." Moreover, all of the Plaintiffs except Keith Ball testified that they were aware of the Defendant's position with respect to vacation pay prior to the expiration of the time to revoke their acceptance. Therefore, since the Plaintiffs signed the separation agreements, terminated their employment and accepted the benefits provided by the voluntary programs, they are estopped from pursuing the claims raised in this lawsuit.
Based on the foregoing analysis, the Court concludes that the Defendant is entitled to judgment as a matter of law.
NOTES
[1] Although the terms of the voluntary programs differ, their vacation pay, benefits and waiver provisions are the same. As the dispute centers around these provisions, the Court will treat the two programs identically for the purposes of this analysis.
[2] The Defendant notes that retirees are not entitled to any payments for unused vacation days under its written vacation policy. Ex. F to the Def.'s Mot. for Summ.J. at 3 ("All vacation, both vested and accrued, must be taken prior to the date of retirement. No pay in lieu of vacation will be granted.") Accordingly, it contends that five out of the seven Plaintiffs would get nothing for their vested but unused vacation days if the terms of the Defendant's standard vacation policy apply.
[3] The Plaintiffs' fundamental misunderstanding regarding the applicability of ERISA to this cause of action is that they are not merely seeking vested vacation benefits to which they are entitled under the Defendant's standard vacation policy. See, e.g., Massachusetts v. Morash, 490 U.S. 107, 114, 109 S.Ct. 1668, 1672-73, 104 L.Ed.2d 98 (1989)("We do not believe, however, that the policy ... to pay employees for unused vacation time constitutes an employee welfare benefit plan."); Shea v. Wells Fargo Armored Service Corp., 810 F.2d 372, 376 (2nd Cir.1987) ("Excluded by the regulatory scheme from classification as employee welfare benefit plans are certain enumerated `payroll practices,' including ... `[p]ayment of compensation while an employee is on vacation or absent on a holiday.'"), quoting 29 C.F.R. § 2510.3-1(b)(3)(1983); Guinn v. Electronic Data Systems, Inc., 752 F.Supp. 713, 716 (S.D.W.Va.1990). Rather, they are seeking vested vacation benefits which they claim were reserved to them in the separation agreements they signed as participants in the voluntary programs. It is the voluntary programs, and not the Defendant's standard vacation policy, that are "employee welfare benefit plans" governed by ERISA. See, e.g., Morash, 490 U.S. at 116, 109 S.Ct. at 1673-74 ("... plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans within the meaning of [ERISA].")(emphasis in original); see also Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir.1993).
[4] In fact, in a memorandum to Fred Olson dated October 20, 1994, Franklin Mange, the lead Plaintiff, acknowledged the Defendant's position regarding vacation pay. Ex. R to Def.'s Mot. for Summ. J. at 1 ("In view of the above I must conclude that it was [the Defendant's] intention to exclude vacation pay earned in FY1994."); see also Ex. H to the Def.'s Mot. for Summ. J. at 70 ("My conclusion was that I had heard this before and that [the Defendant] was in error because this was a contradiction of what was in the ... special voluntary retirement program...."). It is clear that Mange was aware of the Defendant's position, and is nevertheless seeking additional compensation based upon his own interpretation of what the voluntary programs should provide.
[5] Moreover, as the Defendant correctly noted, the cover letter accompanying the summary plan descriptions provides that participating employees "will receive the compensation and benefits described in the plan." Exs. C and D to the Def.'s Mot. For Summ. J. (emphasis added).