990 F.Supp. 762 (1997)
CARBOLINE COMPANY, Plaintiff,
v.
Mark LEBECK and PPG Industries, Inc., Defendants.
No. 4:97CV2366 CDP.
United States District Court, E.D. Missouri, Eastern Division.
December 22, 1997.
*763 Timothy J. Sarsfield, Richard E. Jaudes, Aaron C. Baker, Thompson, Coburn, St. Louis, MO, for Plaintiff.
Fred A. Ricks, Jr., Christine M. Kocot, McMahon and Berger, St. Louis, MO, for Defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on plaintiff's motion for preliminary injunction. A hearing on this matter was commenced on December 5, 1997, and concluded on December 11, 1997. The parties thereafter submitted briefs and proposed orders. For the reasons that follow, the Court will deny the plaintiff's request for a preliminary injunction.

I. Relevant Factual Background

Plaintiff Carboline Company manufactures high performance protective coatings. Defendant Mark Lebeck began his employment with Carboline in 1990 as a General Manager of Sales in the power industry division. On May 1, 1990, Lebeck signed an employment agreement requiring him not to disclose confidential information during and after his employment. The Agreement also contained a noncompete provision under which he agreed not to, "either directly or indirectly, go into any business in competition with Employer within the United States for a period of at least two years" after his termination.
For the power industry Carboline designs, tests, and sells products to electrical utilities, including nuclear power plants, in all fifty states. While conventional power plants can use Carboline's standard formulations, the nuclear industry requires specialized coatings that comply with Nuclear Regulatory Commission regulations. Carboline and Keeler & Long are currently the leading producers of nuclear coatings. Until the fall of 1996, Lebeck had responsibility for pricing strategies, product development and testing, directing regional managers, and determining customer priorities, within the United States, Canada, and some overseas regions, for Carboline's power industry business. For example, in May 1995, Lebeck drafted a memorandum to sales personnel introducing a twelve-point sales strategy aimed at increasing the level of business from Carboline's current nuclear customers. Paul Litszinger, Carboline's Senior Vice President of Sales and Marketing, testified that Lebeck knew the needs, sales, costs, plans, pricing, and profit margins for each power industry customer.
With the advent of industry deregulation and a reduction in the construction of new power plants, Carboline's power division sales declined. Carboline downsized the power division and, in the fall of 1996, transferred Lebeck from the power industry division to distribution, with responsibility for the southeast United States. His new position was essentially a sales role, with responsibility for both power industry customers as well as other customers in his territory.
On March 14, 1997, Carboline offered Lebeck a choice between accepting a sales position in Los Angeles, California, or leaving his employment with Carboline. The transfer *764 position did not have a power industry focus, although, like all Carboline sales persons, Lebeck would call on those power customers in his sales territory. Lebeck testified that he initially considered the transfer, although he had earlier expressed reservations about accepting a position which required relocating his family. In a letter written on April 17, 1997, Lebeck declined the transfer, accepted Carboline's offer of a severance package, and asked to be "totally released" from "any contractual obligations."
On April 30, 1997, after discussions with Carboline, Lebeck signed a termination agreement and mutual release drafted by Carboline. The current dispute arises from the meaning of several provisions in that agreement and the relevant language is set out below. Before signing the agreement, Lebeck announced his intention to accept employment with Vanex, Inc. Although Vanex also manufactures industrial coatings, Carboline managers testified that they did not consider that Lebeck's employment with Vanex would violate his noncompete agreement. Lebeck began working for Vanex in May of 1997.
On September 19, 1997, Lebeck accepted an employment offer from PPG for a sales manager position in its high performance coatings division. As a PPG employee, Lebeck has accompanied PPG dealers on calls to customers, many of whom also purchase from Carboline and whom Lebeck had worked with as a Carboline employee. In October, upon hearing of Lebeck's employment with PPG, Carboline notified PPG that it considered Lebeck to be in violation of his noncompete agreement.
Plaintiff filed the instant suit in November 25, 1997, bringing against Lebeck claims of breach of contract (Count I) and breach of the duty of loyalty (Count IV); against PPG a claim of intentional interference with contract (Count III); and against both defendants claims of civil conspiracy (Count II), misappropriation of trade secrets pursuant to Missouri common law and the Missouri Uniform Trade Secrets Act, Mo.Rev. Stat. §§ 417.450 et seq. (Count V), and tortious interference with business relationships (Count VI). Plaintiff's motion for a temporary restraining order was denied on November 25, 1997, after a hearing at which all parties were represented. Carboline now asks the Court to issue a preliminary injunction restricting Lebeck's employment to preclude him from disclosing or using confidential information, working with specified Carboline customers until April 30, 1999, and working for PPG's recent acquisition, Keeler & Long.
Sometime during the pendency of these proceedings, PPG purchased Keeler & Long, Inc. Keeler & Long is Carboline's top competitor in its nuclear power business. Lebeck worked for Keeler & Long for six years before coming to Carboline. Lebeck testified that he has not been approached regarding a possible role with Keeler & Long.
The May 1, 1990, employment agreement contained the following relevant provisions:
2. Employee ... will treat as confidential and will not disclose, to any third party, any information concerning Employer's business or concerning inventions, processes or methods developed by Employee or by other employees without the written consent of an executive officer ..., whether during or after employment by Employer; and Employee further agrees that upon the termination of said employment, he will not take with him any drawings, blueprints, laboratory notes, formula sheets, or any other matters herein above referred to without the prior written consent of an executive officer.
3. Employee further agrees that he will not, either directly or indirectly, go into any business in competition with Employer within the United States for a period of at least two years following the termination of Employee's employment with Employer. Employee further agrees that he will not within said last-named two-year period, accept employment or in any other way become associated with any other person, firm or corporation within the territorial limits of the United States, which person, firm or corporation is, either directly or indirectly, in competition with the Employer. Employee acknowledges *765 that at the present time Employer is presently engaged in the nationwide selling of corrosion-resistant coatings, seamless flooring systems, industrial coatings and related products. Termination as used herein shall mean termination for whatever the cause thereof and by whomever made.
Elsewhere, the agreement defined "confidential information" as including, but not limited to, "formulae, technical data, performance data, customer's list, [and] product specifications."
The April 30, 1997 "Termination Agreement and Mutual Release" contains the relevant following provisions:
WHEREAS, the parties desire to resolve all matters arising out of Mr. Lebeck's employment by Employer and his subsequent resignation, ...
3. Employer hereby releases, remises, and forever discharges Mr. Lebeck, his agents, assigns and/or heirs, from any and all claims or other causes of action it may have against Mr. Lebeck on account of any contract, supposed liability, or other thing done or omitted, for all time in the past to the effective date of this [agreement].
***
5. Mr. Lebeck acknowledges that this [agreement] has been reviewed in detail with him, and that its language and intended effect have been explained. ... Mr. Lebeck also acknowledges that he has voluntarily entered into this [agreement] of his own free will based only upon the terms and conditions set out herein.
Notwithstanding any other provision of this [agreement], Employer agrees that Mr. Lebeck is not precluded from applying for and receiving unemployment compensation benefits. Nor does this effect Mr. Lebeck's right to obtain his pension/retirement monies due him.
***
9. This [agreement] shall be governed by and construed in accordance with the law of the state of Missouri. This Termination Agreement and Mutual Release constitutes the entire agreement between Employer and Mr. Lebeck and supersedes all prior understandings, whether oral or written, between Employer and Mr. Lebeck.

II. Discussion

In determining whether to issue injunctive relief, the Court must decide whether the balance of equities so favors the movant that justice requires the Court to intervene to preserve the status quo until the merits of the dispute are decided. Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 113 (8th Cir.1981); see also Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994). In making its determination, the Court must consider the following four factors: (1) the threat of irreparable harm to the movant; (2) the state of balance between harm to the movant and the injury that granting the injunction would inflict on other parties; (3) the probability of success on the merits; and (4) the public interest. Dataphase, 640 F.2d at 113. The movant carries the burden of proving that a preliminary injunction should be issued. Modern Computer Systems, Inc. v. Modern Banking Systems, Inc., 871 F.2d 734, 737 (8th Cir.1989). Of course, the Court's holding at this stage of the proceedings is preliminary and the conclusions of law announced by this order are tentative and subject to later consideration when the case is decided on the merits. See Minnesota Mining & Manuf. Co. v. Rauh Rubber, Inc., 130 F.3d 1305 (8th Cir. 1997).
Plaintiff argues that it is entitled to injunctive relief under two theories: (1) Lebeck is bound by the noncompete provision in his 1990 employment agreement and (2) his employment by PPG violates the Missouri Uniform Trade Secrets Act.

A. Success on the Merits

1. Noncompete Clause

In order to prevail on the merits of its noncompete clause claim, plaintiff has to show that (1) the noncompete clause remained valid and enforceable following execution of the 1997 termination agreement and mutual release; (2) the clause is necessary to *766 protect customer lists or trade secrets, Sturgis Equip. Co., Inc. v. Falcon Indus. Sales Co., 930 S.W.2d 14, 16-17 (Mo.Ct.App.1996); and (3) the provision is no more restrictive than necessary and is reasonable as to time and geography. Id. at 17; AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 719 (Mo.Ct. App.1995); Cape Mobile Home Mart, Inc. v. Mobley, 780 S.W.2d 116, 118 (Mo.Ct.App. 1989).
The parties dispute whether the 1997 termination agreement supersedes the employment contract. In addressing this question, the Court begins by examining the language of the termination agreement. A court may not vary the terms of an unambiguous contract. Peterson v. Continental Boiler Works, Inc., 783 S.W.2d 896, 901 (Mo. 1990) (en banc). While collateral facts may be considered to ascertain the subject matter of an unambiguous contract, such facts cannot cause the court to read into a contract something it does not say. Craig v. Jo B. Gardner, Inc., 586 S.W.2d 316, 324 (Mo.1979) (en banc). A contract is ambiguous only if it is reasonably susceptible to more than one meaning. Jake C. Byers, Inc. v. J.B.C. Investments, 834 S.W.2d 806, 816 (Mo.Ct.App. 1992). To determine whether a contract is ambiguous, the court considers the whole instrument and gives the words their natural meanings. Id.
The Court believes that defendants are likely to succeed on the merits of their argument that under Missouri contract law the termination agreement completely supersedes the employment agreement. The termination agreement purports to "resolve all matters arising out of Mr. Lebeck's employment ... and subsequent termination." Paragraph 9 is a merger or integration clause, stating that the termination agreement is the "entire" agreement between the parties, and "supersedes all prior understandings, whether oral or written." In addition, paragraph 5 states that Lebeck entered the agreement based "solely upon the terms and conditions set out herein." Paragraph 5 also specifically exempts particular types of claims from the effect of the agreement. Breach of the noncompete and confidentiality clauses are not exempted. While the release language in paragraph 3 appears to be limited to claims arising before Lebeck's termination, this limitation does not establish that the noncompete clause remains intact, in light of the unambiguous language of paragraph 9.
The Court has considered plaintiff's contention that defendants must prove that the parties intended to rescind the prior agreement and that, because the termination agreement is silent with respect to the employment agreement, no rescission occurred. The cases that plaintiff relies on for this proposition are distinguishable from the present dispute and do not clearly support its position. See Four-Three-O-Six Duncan Corp. v. Security Trust Co., 372 S.W.2d 16, 23 (Mo.1963) (concerning the effect of a clear rescission of one agreement upon the validity of a separate, simultaneous guaranty agreement); Mange v. Petrolite Corp., 960 F.Supp. 206 (E.D.Mo.1997) (determining that employees' release of ERISA claims pursuant to a separation agreement was knowing and voluntary). Plaintiff also cites two cases applying Georgia law which offer no guidance for resolving the current dispute. See Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. Partnership, 977 F.Supp. 1386 (D.Minn. 1997); Diamondhead Corp. v. Robinson, 144 Ga.App. 60, 240 S.E.2d 572 (1977). Furthermore, "parties to a contract may rescind it by making a new contract inconsistent therewith." 17A Am.Jur.2d Contracts § 557 (1991).
Even if the noncompete provision remains in force, it is not evident that it can be enforced. Assuming that plaintiff has established a protectible interest in trade secrets or customer lists, and even though plaintiff seeks to enforce the contract in a more limited manner than set out in the contract,[1] *767 plaintiff has not presented evidence to establish that the two-year restriction is reasonable. First, Lebeck was removed from the power industry position in November 1996. While he continued to have some role with power plants, plaintiff has not established the extent of that involvement. Furthermore, plaintiff has not shown the period of time within which Lebeck's relevant knowledge remains current.
For the above reasons, the Court believes that the likelihood of success on the merits factor does not favor plaintiff on its contract claim.

2. Trade Secrets Claim

The Missouri Uniform Trade Secrets Act provides injunctive relief against "actual or threatened misappropriation" of trade secrets. § 417.455. The Act defines "trade secret" as
information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that
(a) [d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
(b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
§ 417.453(4). In seeking to enjoin a former employee's current work, plaintiff must do more than assert that a skilled employee is taking his abilities to a competitor. See PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir.1995).
Plaintiff contends that Lebeck was entrusted with trade secrets, including pricing and demonstration strategies, research and development projects, the strengths and weaknesses of Carboline products, upgrade schedules, Carboline's competitive strategy with respect to PPG, customer lists and preferences, and specialized price margins and strategies. In addition, Carboline contends that the documents that Lebeck kept after his termination were all trade secrets. Those documents have all now been returned to Carboline, and Lebeck testified that he retained no copies. While plaintiff may choose to pursue damages with respect to Lebeck's retention of documents in the first instance, that is a matter for trial, not for preliminary equitable relief.
Plaintiff contends that Lebeck possesses knowledge that he will inevitably disclose to its competitor. Defendants argue that any information that Lebeck possessed was of the sort that quickly becomes stale. For instance, plaintiff submits a power industry marketing plan that Lebeck created for fiscal year 1997, which ended May 30, 1997. Plaintiff has not presented evidence that Lebeck helped compose the 1998 plan. Cf. PepsiCo, Inc., 54 F.3d at 1269 (finding inevitable disclosure where former employee participated in and drafted current annual operating plan). Furthermore, much of the information contained in that plan is readily available in trade publications. Similarly, other documents that Lebeck retained are not conclusively trade secrets: the proposal submitted to Northeast Utility was a group effort, with another firm taking the lead role. The proposal contains no information regarding specific Carboline products.
Plaintiff did not present convincing evidence that it took measures to maintain the secrecy of its documents. Litszinger testified that Carboline maintained strict security measures with respect to computer access. All employees signed the Employee's Agreement containing the confidentiality provision. However, plaintiff did not take more specific measures. For example, the Multi-Gard testing data included results from outside laboratories. Plaintiff did not indicate that it entered confidentiality agreements with these labs. The data sheets were sent to "qualified" customers, but plaintiff did not indicate how it determined who was qualified nor did it present evidence that it kept track of which customers received the data. The data sheets do not contain a label limiting distribution. Salespeople had access to the data sheets, and plaintiff did not establish *768 that it has in any way restricted their use of the information. Cf. Uncle B's Bakery, Inc. v. O'Rourke, 920 F.Supp. 1405, 1413 (N.D.Iowa 1996) (visitors to plant required to sign a confidentiality agreement, while suppliers signed exclusivity agreements).
Plaintiff cites La Calhene, Inc. v. Spolyar, 938 F.Supp. 523 (W.D.Wis.1996) to support its assertion that its security measures were sufficient. In La Calhene, the Court issued a preliminary injunction against a former employee despite the fact that the employer did not have a formal program for identifying trade secrets. However, the employer there presented its other efforts in far greater detail than what was provided to this Court. See id. at 527-28.
Based on the foregoing, the Court determines that this factor does not support issuing a preliminary injunction.

B. Threat of Irreparable Harm to Movant

This factor does not clearly favor either party. With respect to the documents that Lebeck retained following his termination, he testified that he has now returned them all and, thus, plaintiff cannot establish threat of irreparable harm arising from their future use. Plaintiff has an adequate remedy at law for any past wrong. With respect to nondocumentary information, plaintiff has not established that Lebeck possesses the kind of particularized and timely knowledge of its business that will give PPG an unfair competitive advantage. Since joining PPG, Lebeck has accompanied PPG distributors on calls to customers he served for Carboline. According to the testimony, however, Carboline does not have exclusive relationships with those customers. Furthermore, Lebeck first met some of the individuals concerned while he worked for Keeler & Long.

C. Balance of Harms

A preliminary injunction, even the more narrow relief that plaintiff now requests, would cause significant harm to Lebeck by limiting him in the practice of his profession. In the absence of a finding that Carboline will suffer irreparable harm if the injunction does not issue, this factor must favor defendant. Cf. Uncle B's Bakery, Inc. v. O'Rourke, 920 F.Supp., 1405, 1436-38 (N.D.Iowa 1996) (concluding that the balance of harms favored employer after determining that employee was bound by a noncompete clause and that employer would suffer irreparable harm from the disclosure of heavily-guarded trade secrets).

D. Public Interest

In general, restraints on trade and employment are disfavored as diminishing competitive opportunities. While the law recognizes the enforceability of reasonable noncompete clauses, the Court has reservations with respect to the duration of the now-modified restriction that plaintiff seeks to impose on Lebeck. Similarly, the public interest in protecting valid trade secrets has not yet been implicated by the facts of this case. Thus, this factor favors of the defendants.
In summary, the Court has examined the balance of the equities in light of the Dataphase factors and concludes that plaintiff has not met its burden of showing that a preliminary injunction should issue.

III. Defendant's Motion to Dismiss

Defendants have filed a motion to dismiss all counts of plaintiff's complaint for failure to state a claim on which relief may be granted, based on the existence of the termination agreement. This is not a proper basis for granting a Rule 12(b)(6) motion, and the Court declines to convert the motion to one for summary judgment, as the Court believes factual disputes remain at this point. The motion to dismiss will therefore be denied.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motions for a preliminary injunction [# 5-2] and for adoption of its revised preliminary injunction [# 20] are denied.
IT IS FURTHER ORDERED that defendants' motion to dismiss for failure to state a claim [# 8] is denied.
Separate orders referring this case to mediation and setting a further Rule 16 conference are entered this same date.
NOTES
[1] The noncompete provision as written prohibited Lebeck from working "directly or indirectly" for any employer "within the territorial limits of the United States" that is "in competition" with Carboline for two years. Following the preliminary injunction hearing, plaintiff modified its request for relief to prohibit Lebeck from conducting PPG business within several listed counties with forty-two specific customers. Carboline also requests an order preventing Lebeck from working within PPG for the newly acquired Keeler & Long.