# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1146

_____

Synergetics, Inc.,

        Appellee,

        v.

Charles Richard Hurst, Jr.;
Michael McGowan

        Appellants.

\* \* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted: October 18, 2006
Filed: February 5, 2007

_____

Before MELLOY, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Synergetics, Inc., a company that designs, manufactures, and sells ophthalmic equipment used in eye surgeries, sued former employees Appellants Charles Richard Hurst, Jr. and Michael McGowan for (1) trade secret misappropriation, (2) breach of contract, (3) intentional interference with business relationships, and (4) breach of fiduciary duty. A jury found for Synergetics and awarded compensatory and punitive

damages. The district court[1] entered judgment consistent with the jury's findings, enjoined Hurst and McGowan from using or disclosing Synergetics' trade secrets for two years, required Hurst and McGowan to destroy the misappropriated information and products developed from that information, and denied the motion for remittitur and proposed judgment. On appeal, Hurst and McGowan argue that the district court should have granted their (1) motion in limine to exclude the testimony and reports of a Synergetics' expert witness, (2) motion for summary judgment or motion for judgment as a matter of law, and (3) proposed judgment and motion for remittitur. We affirm.

**I.**

Because the jury ruled in Synergetics' favor on all four claims, we provide the following recitation of facts in the light most favorable to the jury's verdict, giving all reasonable inferences to Synergetics. See Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, 434 F.3d 1081, 1084 (8th Cir.), cert. denied, 126 S. Ct. 2363 (2006).

Synergetics specializes in the sale of precision instruments and disposable laser probes used during vitreoretinal procedures, which are surgeries performed at the back of the eye typically involving the re-attachment of the retina. Synergetics was formed in 1992 by Gregg Scheller, who had previously worked as a mechanical and design engineer for other ophthalmic instrument manufacturers. Scheller hired Christopher Lumpkin to work as an engineer developing prototypes. Lumpkin later left Synergetics as an employee and moved to Colorado, but he maintained a consulting arrangement with Synergetics. Through this arrangement, Lumpkin continued to

---

[1]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

develop products for Synergetics on a part-time basis and continued to work at Synergetics' Missouri plant one week per month. Synergetics also employed Michael Auld as head of research and development.

In the vitreoretinal industry, there are four major laser manufacturers. Of the four, Iridex (also referred to in the record as Iris) employed a technology that prevented the use of competitors' laser probes on its lasers. Because of its high quality, the Iridex laser is the laser most widely used by hospitals and doctors. After almost four years of research and development, Synergetics began marketing an adapter/connector system that allowed the connection of Synergetics' laser probes to Iridex lasers as well as to other laser brands. Thus, Synergetics became the only company, other than Iridex, that provided laser probes that could be used on Iridex lasers. Auld was the direct inventor of this adapter/connector system.

In 2000, Synergetics hired Hurst and McGowan to fill high-level sales positions with the company. Hurst was responsible for management of personnel and accounts in the southern and western United States. McGowan handled personnel and accounts in the eastern United States. Through these positions, Hurst and McGowan had access to confidential sales, marketing, research, and development information, and they were members of Synergetics' Presidential Advisory Council, the company's most strategic committee. On February 5, 2001, Hurst and McGowan entered into separate, but identical, confidentiality agreements with Synergetics, in which each agreed that-- while employed or after the termination of their employments--they would not "disclose or use in any manner whatsoever, any of the Confidential Information" acquired during their employment with Synergetics. The agreements further provide that Hurst and McGowan must return all company materials such as records, files, and photographic materials upon termination of their employment.

While still employed by Synergetics, Hurst and McGowan decided to form a competing company. In furtherance of this plan, they hired Lumpkin to build a

competing adapter/connector system for the Iridex laser. By using spare parts from Synergetics, Lumpkin was able to do this in six hours. While maintaining their employment with Synergetics, Hurst and McGowan: (1) entered into a confidentiality agreement with Peregrine Surgical, Ltd., one of the manufacturers used by Synergetics, enabling Hurst and McGowan to enter into discussions with Peregrine Surgical concerning production of competitive items, (2) contacted Synergetics' customers to discuss the formation of the new company, and (3) constructed prototypes of products for testing and evaluation. Hurst and McGowan did not reveal these plans and actions to Synergetics, realizing that to do so would jeopardize their employment. Due to poor job performance, however, Hurst resigned his employment in July 2002, and McGowan was terminated in September 2002. Two weeks after McGowan's termination, Hurst and McGowan incorporated their new company, Innovatech Surgical, Inc., with McGowan serving as president and Hurst serving as secretary. Innovatech sought to market and sell ophthalmic medical equipment, including a directional ophthalmic laser probe in direct competition with Synergetics' best-selling laser probe.

Because Lumpkin did not possess the necessary skills to create the design drawings required for production of the adapter/connector system and other competitive products, he contacted Synergetics' employee, Auld, to obtain help in creating design drawings for Innovatech following Hurst and McGowan's termination from Synergetics. Auld did this, in large part, by copying Synergetics' drawings. Such copies included specific, detailed measurements and tolerances. Hurst and McGowan were aware that Auld was still employed by Synergetics and that Auld was assisting Lumpkin in creating these drawings. As a result of these actions, only Synergetics, Innovatech, and Iridex had the technology and products to attach disposable laser probes to the Iridex laser unit.

On February 11, 2004, Synergetics filed suit against Hurst and McGowan in Missouri state court. The case was removed to the United States District Court on the

basis of diversity jurisdiction. In September 2005, a jury trial was held, and the jury returned a verdict in favor of plaintiffs. The jury found, by a preponderance of the evidence, that (1) Hurst and McGowan had misappropriated Synergetics' trade secrets concerning pricing of products, product selections, sales data, prioritization of products, and technical information regarding the tolerances and torque of the adapter/connector system, (2) Synergetics suffered harm as a direct result of the misappropriation of the trade secrets, (3) either Hurst or McGowan intentionally interfered with Synergetics' business relationships with twenty-three separate businesses from which Synergetics suffered damages, (4) Hurst and McGowan breached their confidentiality agreements with Synergetics, and (5) Hurst and McGowan breached a fiduciary duty of loyalty while employed by Synergetics. The jury determined that Synergetics suffered actual damages in the amount of $1,759,165. The jury further awarded punitive damages against Hurst and McGowan in the amount of $293,194.16 per defendant. Following denial of Appellants' motion for remittitur and proposed judgment, the district court entered judgment against Hurst and McGowan in accordance with the jury's verdict and enjoined Hurst and McGowan from using or disclosing the trade secret information for two years.

## II.

Appellants first assert that the district court erred in denying their motion in limine to exclude the expert testimony and report of Ronald Vollmar, a certified public accountant, financial analyst, and fraud examiner. Vollmar testified about the economic damages Synergetics suffered due to Appellants' actions. Appellants contend that Vollmar's testimony should not have been admitted because his opinions were based on an incorrect assumption regarding the number of suppliers in the relevant market.

Federal Rule of Evidence 702 provides that if expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert may

testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." See Fed. R. Evid. 702. Trial courts serve as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("We conclude that Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to [expert] testimony based on 'scientific' knowledge, but also to [expert] testimony based on 'technical' and 'other specialized' knowledge."). In exercising this gatekeeping function, the trial court must first make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," focusing specifically on the methodology and not the conclusions. See Daubert, 509 U.S. at 592-93. Second, the court must ensure that the testimony is relevant and will aid the trier of fact. See id. at 591-92.

Appellants do not contest Vollmar's qualifications or whether the subject of his proposed testimony would aid the jury. Instead, Appellants contend that Vollmar's methodology was unreliable because "the key assumption upon which his opinion is based, essentially that the relevant market is a two supplier market, is false and ignores the existence of significant competition in the market." (Br. of Appellant at 17.) Using sales information provided by Innovatech and Synergetics, Vollmar identified the common customers of both companies. Then, he "identified lost sales on products sold by Innovatech that were previously purchased from Synergetics and products sold by Innovatech that were only previously available from Synergetics." (Pl.'s Ex. 44.) Where Innovatech sold adapters/connectors, the calculations also included related sales of laser probes. (Id.) During cross-examination at trial, Vollmar explained that he did not consider possible competition from Iridex because he focused only on those Innovatech customers who had previously been Synergetics'

customers.  Thus, Vollmar did not include any portion of Innovatech customers, other than those who had previously been Synergetics' customers, in the damages assessment.  (Tr. Vol. IV, 4-5.)

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (quoting Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995) (internal citations and quotations omitted)). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion."  Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996), cert. denied, 520 U.S. 1196 (1997).  An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury."  Bonner, 259 F.3d at 929-30.  Vollmar's testimony was not so fundamentally unsupported that it could offer no assistance to the jury.  He explained his methodology in calculating the damages, and the Appellants had the opportunity to challenge Vollmar's assumptions and methodology, both through cross-examination and by presenting their own expert witness on damages.  While other methods for calculating damages may be available, so long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony.  See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000) (no abuse of discretion in allowing plaintiff's expert witness to testify as to damages where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with ultimate decision as to which damages theory was more sound).

The district court did not abuse its considerable discretion in permitting Vollmar's testimony.

## III.

## A.

Appellants next argue that the district court erred in denying their original motion for summary judgment and their motion for judgment as a matter of law at the close of all evidence on the claims of trade secret misappropriation, intentional interference with business relationships, breach of contract, and breach of fiduciary duty.

After a full trial on the merits, we do not review a denial of summary judgment as such denial is interlocutory in nature. See Eaddy v. Yancey, 317 F.3d 914, 916 (8th Cir. 2003) (citing Bakker v. McKinnon, 152 F.3d 1007, 1010 (8th Cir. 1998)). Thus, our review here is only from the denial of judgment as a matter of law. "We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court." Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 899 (8th Cir. 2006). To grant judgment as a matter of law, the court must find that there is no legally sufficient evidentiary basis to support a jury verdict in the non-moving party's favor. See Fed. R. Civ. P. 50(a)(1). All factual inferences are drawn in favor of the non-moving party, and the court avoids making credibility assessments or weighing the evidence. See First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005) (quoting Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001)).

**B.**

Under The Missouri Uniform Trade Secrets Act, misappropriation of a trade secret is defined as:

(a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:

a. Used improper means to acquire knowledge of the trade secret; or

b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

i. Derived from or through a person who had utilized improper means to acquire it;

ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Mo. Stat. Ann. § 417.453(2) (West 2001).

Appellants argue that Synergetics failed to offer any evidence that Appellants knew or had reason to know that the engineering drawings prepared by Auld were copied from Synergetics' material. Further, Appellants contend that "the information claimed to have been misappropriated is the type that grows stale relatively quickly" and, thus, should not be afforded protection over two years after Appellants' termination.

The jury found that Synergetics owned a trade secret for, *inter alia*, dimensions and tolerances information regarding its adapter/connector system, and that Appellants misappropriated this trade secret. At trial, the jury watched the videotaped deposition of Michael Auld. Auld testified that Lumpkin had given him some crude pencil drawings of the adapter/connector Lumpkin had constructed using spare Synergetics' parts and asked Auld to make the necessary engineering designs. Auld admitted that he created these by copying, or "cutting and pasting" from, Synergetics' engineering drawings while employed by Synergetics. McGowan testified at trial that Lumpkin informed him that Auld was assisting with the engineering drawings and that McGowan knew Auld was employed by Synergetics at the time he was assisting. After learning of Auld's involvement, McGowan then began communicating on a monthly basis with Auld about the drawings. Additionally, the jury was presented testimony from Scheller that Synergetics had taken years to design and develop its adapter/connector system, but Lumpkin testified that he needed only six hours to design a similar product. Clearly, there is sufficient evidence supporting the jury's verdict that Appellants misappropriated Synergetics' trade secrets pertaining to the specifications found in the engineering drawings.

While Appellants only challenge whether there was sufficient evidence to support a finding of misappropriation of trade secrets pertaining to Auld's actions of copying Synergetics' engineering drawings, the jury also found that Synergetics owned trade secret information pertaining to product pricing information, customer-specific product purchases, quantities of products its customers purchased, and prioritization of its products which Appellants also misappropriated. Such information would have been commonly known and used by Appellants through their employment responsibilities as high-level salesmen.

Appellants further argue that the misappropriated information grew stale and thus was not deserving of trade secret protection. It is unclear from their brief exactly what information they claim grew stale and when that occurred. Rather, they cite

-10-

Carboline Co. v. Lebeck, 990 F. Supp. 762 (E.D. Mo. 1997), to support their argument. In rejecting this argument, the district court noted that "defendants have cited no additional support for their position, nor provided any facts and circumstances to suggest the information is now stale beyond a comparison to the 13 month time period in Carboline." Appellants have done nothing more to advance this argument on appeal. Determination of when trade secret information becomes stale cannot be made by reference to a bright line rule and necessarily requires fact specific consideration. Cf. Avtel Servs., Inc. v. United States, 70 Fed. Cl. 173, 191 (Fed. Cl. 2006) ("In general, *although largely a fact and case-specific inquiry*, information loses its confidential nature once it becomes stale.") (emphasis added). As the district court determined, evidence was presented that Appellants continued to obtain trade secret information after their termination, that the Innovatech adapter and laser probes could not have been reverse manufactured absent the trade secret information because of the detailed specifications and this information is not publicly available, and that Appellants continued to use sales data and information to reach sales agreements with Synergetics' customers.

## C.

Appellants contend that the breach of contract claim should have been dismissed. Their first argument is that Synergetics failed to submit sufficient evidence of a breached contract. On February 5, 2001, both Hurst and McGowan signed confidentiality agreements with Synergetics. These agreements provided that Appellants would not disclose any confidential information such as customer and supplier lists, pricing lists, production and pricing methods, inventions, discoveries, and developments. The agreements further provided that Appellants would return any Synergetics' property upon termination of employment. Synergetics presented evidence that Appellants used confidential information to develop a competing product and to target Synergetics' customers. Also, Synergetics presented evidence that Appellants failed to return certain items of Synergetics' property, such as files

containing confidential sales data. Therefore, Appellants' argument that sufficient evidence of a breach of contract was not presented fails.

Appellants' second argument is that the confidentiality agreements are in reality restrictive covenants, or covenants not to compete, that are not enforceable because the agreements are not limited in time and geography. Appellee responds that the confidentiality agreements do not require time or geographic limitations to be valid and enforceable.

The use of restrictive covenants is one way to protect trade secrets, see Continental Research Corp. v. Scholz, 595 S.W.2d 396, 400 (Mo. Ct. App. 1980), however, Appellants' characterization of the confidentiality agreements as restrictive covenants is misplaced. While a restrictive covenant may be used to protect a trade secret, not every agreement designed to protect a trade secret is a restrictive covenant. Restrictive covenants limit the exercise or pursuit of an individual's occupation. See AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995). Restrictive covenants are in restraint of trade, thus to be valid and enforceable, they must be reasonable as to time and space. See id.

In their reply brief, Appellants impliedly concede that the agreements are confidentiality agreements and then argue that confidentiality agreements need time and geographic limitations, similar to restrictive covenants, to be valid. In support of this contention, Appellants again cite Carboline Co. v. Lebeck, 990 F. Supp. 762 (E.D. Mo. 1997). The Carboline opinion addressed the need for time and geographic limitations regarding the plaintiff's "noncompete clause claim." Carboline Co., 990 F. Supp at 765-66. Further, the court in Carboline recognized that the employment agreement contained both "noncompete and confidentiality clauses." Id. at 766. Appellants have failed to cite to any requirement under Missouri law that confidentiality agreements must contain time and geographic limitations to be valid,

nor have we located such a requirement, thus we cannot say that the agreements are unenforceable for this reason.

**D.**

Under Missouri law, intentional interference with a contract or business relationship requires proof of (1) a contract or valid business expectancy, (2) defendant's knowledge of the contract or relationship, (3) a breach induced or caused by defendant's intentional interference, (4) absence of justification, and (5) damages. See Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996) (en banc). "While lawful competition would be a defense, competing by improper means, including the use of a misappropriated trade secret obtained in violation of a fiduciary duty is not a valid justification." Lyn-Flex West, Inc. v. Dieckhaus, 24 S.W.3d 693, 700 (Mo. Ct. App. 1999) (citing Briner Elec. Co. v. Sachas Elec. Co., 680 S.W.2d 737, 741 (Mo. Ct. App. 1984)). Appellants contend that Synergetics failed to present "evidence of any improper means utilized by appellants." (Appellants' Br. at 29.) Appellants admit that this argument is intertwined with their argument that they did not misappropriate trade secrets or breach their confidentiality agreement with Synergetics. As explained above, Synergetics submitted sufficient evidence to support its misappropriation claim and its breach of contract claim, and hence has submitted sufficient evidence to support the claim of intentional interference with a contract or business relationship.

**E.**

In its third amended complaint, Synergetics added a claim for breach of fiduciary duty of loyalty. A breach of the duty of loyalty "arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which, by definition, is to gain advantage over a competitor." Scanwell Freight Express STL, Inc. v. Chan, 162 S.W.3d 477, 479 (Mo. 2005) (en banc).

Although permitted to make arrangements to compete with an employer prior to termination of employment, an employee may not use confidential information peculiar to or acquired from his employer, nor may the employee solicit customers for his rival company. See id. at 481 (citing Restatement (Second) of Agency, § 393 cmt. e (1958)). When viewed in the light most favorable to the verdict, it is clear that the Appellants' actions violated their duty of loyalty to Synergetics. Appellants used confidential trade secret information to begin the design of competitive products, used pricing and product information to target Synergetics' customers, and began solicitation of Synergetics customers prior to the termination of their employment.

Therefore, the district court did not err in denying the motion for judgment as a matter of law on Synergetics' claims of misappropriation of trade secrets, breach of contract, intentional interference with business relationships, or breach of fiduciary duty of loyalty.

## IV.

After the jury returned a verdict in Synergetics' favor and awarded actual damages of $1,759,165 against the Appellants jointly and severally, and punitive damages of $293,194.16 against each Appellant, the Appellants filed a motion for remittitur and proposed judgment, arguing that (1) actual damages were excessive and not supported by the evidence, (2) punitive damages were excessive because Appellants' actions were not outrageous, and (3) injunctive relief was not proper because the "head start" period had expired.

## A.

"We will only reverse a district court's denial of a motion for remittitur 'upon a manifest abuse of discretion or because the verdict is so grossly excessive the result is monstrous or shocking.'" Hite v. Vermeer Mfg. Co., 446 F.3d 858, 869 (8th

Cir. 2006) (quoting Callatine v. Staff Builders, Inc., 271 F.3d 1124, 1133-34 (8th Cir. 2001.)) When presented with a question as to whether a state law claim damage award is excessive, state substantive law guides our review. Jones v. Swanson, 341 F.3d 723, 736 (8th Cir. 2003). In Missouri, courts generally defer to the jury's decision concerning the amount of damages, and only overturn a jury's verdict when the defendants demonstrate that (1) "some event occurred at trial that incited the bias and prejudice of the jury" and (2) "the verdict is so grossly excessive . . . so as to shock the conscience of the court." Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 822 (Mo. 2000) (per curiam en banc) (citing Means v. Sears, Roebuck & Co., 550 S.W.2d 780, 788 (Mo. 1977) (en banc) and Tune v. Synergy Gas Corp., 883 S.W.2d 10, 21 (Mo. 1994) (en banc)), cert. denied, 532 U.S. 990 (2001). Actual damage awards "will not be disturbed unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." Williams v. Williams, 99 S.W.3d 552, 557 (Mo. Ct. App. 2003) (citing Montrose Sav. Bank v. Landers, 675 S.W.2d 668, 672 (Mo. Ct. App. 1984)). Punitive damage awards are determined after considering factors such as the degree of malice or outrageousness of the defendants' conduct, aggravating and mitigating circumstances, the defendants' financial status, the character of both parties, the injury suffered, the defendants' standing or intelligence, and the relationship between the two parties. Abuse of discretion in the award of punitive damages under Missouri law is found where the award of punitive damages is so disproportionate to the relevant factors that it becomes clear that the determination was based on improper motives or clear absence of the honest exercise of judgment. Call v. Heard, 925 S.W.2d 840, 849 (Mo. 1996) (en banc), cert. denied, 519 U.S. 1093 (1997).

The jury's verdict on actual damages does not shock the court's conscience. It is obvious that the jury believed and relied upon the testimony of Vollmar, Synergetics' expert witness, regarding damages. Vollmar testified that, based on his calculations, Synergetics suffered economic damages of $1,759,165 (Tr. Vol III, 185; Pl.'s Ex. 44, 392), the exact amount awarded by the jury as actual damages.

According to Vollmar's report, Synergetics' damages were based on lost profits from sales, price erosion, and out-of-pocket expenses. We cannot say that this damages award is outside of the evidence presented at trial, and thus we will not disturb it.

Likewise, the jury's award of punitive damages is not so disproportionate as to warrant reversal. Evidence was presented that Appellants, while still employed by Synergetics, began designing a competitive product using Synergetic's materials and designs. Further, even after their employment was terminated, Appellants continued to use the trade secret information and the assistance of Lumpkin and Auld, individuals who Appellants knew had a duty of loyalty towards Synergetics. After incorporating Innovatech, Appellants used the sales information they had acquired while employed by Synergetics to target Synergetics' customers and underprice Synergetics' adapter/connector system for the Iridex laser. The jury was permitted to consider the nature of this conduct, the Appellants' high-level sales positions at Synergetics, the damages suffered by Synergetics, and the steps taken by Appellants to conceal their activities, in reaching the punitive damages determination. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 576 (8th Cir. 1997) (reviewing factors to be considered under Missouri law). The district court did not abuse its discretion in denying the motion for remittitur.

**B.**

Finally, Appellants argue that the district court erred in granting injunctive relief pertaining to the misappropriated trade secrets because the "head start" period had expired. The district court enjoined Appellants from using or disclosing for a prospective period of two years any of Synergetics' trade secrets, including the dimensions and tolerances of the Iridex adapter/connector, surgical forceps, and scissors products; pricing information; product information; product prioritization; and other information regarding customers. The court determined that two years was

the period of time Appellants would have needed "to develop such data on their own through observation and investigation."

This court reviews the district court's grant of injunctive relief for an abuse of discretion. See Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 902 (8th Cir. 2005). Injunctive relief is a proper remedy under Missouri law for misappropriation of trade secrets. See Mo. Ann. Stat. § 417.455(1) (West 2001) ("Actual or threatened misappropriation may be enjoined."). Additionally, in the confidentiality agreements, Appellants agreed that injunctive relief was a proper remedy if the agreements were violated. In cases involving the misappropriation of trade secrets, Missouri courts employ the "head start" rule, which provides that by misappropriating the trade secrets, a defendant is able to "cut short" the time it would normally take to produce and market a competitive product. See Superior Gearbox Co. v. Edwards, 869 S.W.2d 239, 250-51 (Mo. Ct. App. 1993), see also, Khazai v. Watlow Elec. Mfg. Co., 201 F. Supp. 2d 967, 975 (E.D. Mo. 2001) (applying "head start" rule in trade secret misappropriation case). A defendant should be enjoined only for the time it would take to produce and market the competitive product, absent the misappropriation. See Superior Gearbox, 869 S.W.2d at 250-51.

Evidence adduced at trial supports the conclusion that it took approximately four years for Synergetics to develop its adapter/connector system and that it would take approximately thirty months to regain lost customers. Also, Synergetics presented evidence that the Appellants continued to obtain trade secret information following their termination from Synergetics. The district court determined that the two-year injunctive period consisted of the time it would have taken Appellants to independently develop both the scientific and sales data it misappropriated from

Synergetics.  Thus, the district court did not abuse its discretion in setting the two-year injunctive period.

## V.

Accordingly, we affirm in all respects.

_____